**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MELISSA MUNION,<br><br>               Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>               Defendant. | CASE NO. 4:24-CV-01348-BYP<br><br>DISTRICT JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Melissa Munion ("Plaintiff" or "Ms. Munion") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.     Procedural History

Ms. Munion filed her SSI and DIB applications on May 12, 2022, alleging a disability onset date of February 21, 2022. (Tr. 72, 81.) She asserted disability due to bilateral carpal tunnel syndrome, right thumb reconstruction, depression, and anxiety. (*Id.*) Her applications were denied at the initial level (Tr. 71, 90) and upon reconsideration (Tr. 91, 103), and she

1

requested a hearing (Tr. 141).  A hearing was held before an Administrative Law Judge ("ALJ") on May 2, 2023.  (Tr. 37-70.)

The ALJ issued a decision on September 6, 2023, finding Ms. Munion was not under a disability within the meaning of the Social Security Act since February 21, 2022, the alleged onset date.  (Tr. 15-36.)  Ms. Munion requested review of the ALJ decision (Tr. 230-31), which was denied by the Appeals Council on June 18, 2024 (Tr. 1-7), making the ALJ's decision the final decision of the Commissioner.  Ms. Munion then filed the pending appeal (ECF Doc. 1), which is fully briefed and ripe for review (ECF Docs. 7, 9).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Munion was born in 1969 and was 52 years old on the alleged disability onset date, making her an individual closely approaching advanced age under Social Security regulations on the alleged onset date.  (Tr. 72.)  She had at least a high school education.  (Tr. 73.)  Ms. Munion had not worked since February 21, 2022, the alleged onset date.  (Tr. 72.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

##### i.     Hand Treatment

Prior to her alleged onset date,[1] Ms. Munion was diagnosed with bilateral thumb CMC joint arthritis and carpal tunnel syndrome, greater in the right hand than the left.  (Tr. 421.)  On May 26, 2021, she underwent an electromyography ("EMG") that showed prolonged median sensory latency at the right wrist, abnormal combined sensory index on the left, and focally slow bilateral median motor conduction velocity across the wrist.  (Tr. 395.)  Compared to the

---

[1] Ms. Munion's treatment prior to the alleged onset date of February 21, 2022 is discussed more summarily herein.

previous year, her right median motor conduction was stable, and the left had worsened.  (Tr. 396.)  In March, June, September, and October 2021, Plaintiff received injections for carpal tunnel and hand/wrist pain at Mercy Health Howland Physical Medicine and Rehabilitation in Warren, Ohio.  (Tr. 384, 386, 388, 391, 397.)  In addition to steroid injections, Plaintiff treated her carpal tunnel symptoms with gabapentin and meloxicam.  (Tr. 576; *see* Tr. 419, 613, 735.)

On February 22, 2022, Ms. Munion underwent carpal tunnel release surgery on the right wrist, a right thumb trapiezectomy with ligament reconstruction, and steroidal injections in the left wrist and thumb.  (Tr. 573.)  On March 3, 2022, at her first follow-up appointment with her surgeon Adrian Butler, MD, Ms. Munion reported no pain, and x-rays displayed stable thumb arthroplasty.  (Tr. 463.)  Dr. Butler removed her sutures, referred her for therapy, and set a follow-up in four weeks.  (*Id.*)

On March 23, 2022, Ms. Munion presented to Daphne Bonner, OT, at Mercy Health Physicians Youngstown Specialty Care for occupational therapy.  (Tr. 561-65.)  During the evaluation, Ms. Munion guarded her right hand "100%" and relied heavily on her non-dominant wrist/hand.  (Tr. 564.)  OT Bonner documented deficiencies in Ms. Munion's ADLs (activities of daily living), strength, fine motor coordination, range of motion, pain, and scar adhesion/skin integrity.  (Tr. 562.)  Ms. Munion reported difficulty cutting food and brushing her hair and teeth but was able to bathe, dress, and use the restroom.  (Tr. 564.)  Her pain was a 4-9 on a scale of 1-10.  (*Id.*)  On her right hand, sensation and opposition were intact and supination and probation were within normal limits.  (*Id.*)  She had moderate difficulties with fine motor control and dexterity.  (*Id.*)  OT Bonner assessed Ms. Munion with "good" rehab potential.  (Tr. 565.)

At an occupational therapy session on March 31, 2022, OT Bonner noted that Ms. Munion was making good progress in her plan of care.  (Tr. 558.)  Ms. Munion reported using her hand more at home and feeling pleased with her progress.  (*Id.*)

On April 7, 2022, Ms. Munion saw Sara J. Zatchok, PA, at Dr. Butler's office for her six-week follow-up after surgery.  (Tr. 417.)  Her incisions were healing well, she had full flexion and extension of all fingers, and x-rays show a stable thumb arthroplasty.  (*Id.*)  She still had difficulty with thumb adduction and was referred for continued therapy.  (*Id.*)

Ms. Munion attended occupational therapy two times a week throughout April 2022. While she continued to report mild pain (Tr. 535 (1/10), 538 (1/10), 542 (1/10), 545 (1/10), 548 (1/10), 552 (1/10), 554 (2/10)), she also made progress in her treatment goals (Tr. 536, 539, 543, 546, 549, 552, 555).  At an April 28 appointment, she did tell Jeremy Rising, OT, that her pain was 6/10 due to having done laundry the day before and expressed concerns about returning to work full time.  (Tr. 532-33.)  OT Rising documented that she nevertheless tolerated all exercises and stretches that day and was making "good progress."  (Tr. 533.)

On May 2, 2022, Ms. Munion attended a follow-up appointment with Dr. Butler.  (Tr. 413-16.)  She reported minimal pain but complained of weakness in her right hand.  (Tr. 413.) Her right upper extremity bore a mature scar, had a negative CMC grind test, and was neurovascularly intact.  (Tr. 415.)  Her left upper extremity was positive on Tinel's and Durkan's tests and was mildly positive on CMC grind, but demonstrated full flexion and extension of the fingers, and 5/5 strength with no atrophy.  (*Id.*)  X-rays of her hands showed stable right thumb arthroplasty, Eaton Littler stage III thumb CMC joint arthritis on the right, and stage II-III thumb CMC joint arthritis on the left.  (*Id.*)  Dr. Butler gave her a cortisone injection in the left hand.

4

(Tr. 415-16.)  He diagnosed left carpal tunnel syndrome, left thumb CMC joint arthritis, anxiety, and depression.  (Tr. 415.)

That same day, Ms. Munion also attended occupational therapy with OT Rising.  (Tr. 527-30.)  She reported her pain was 6/10 with mild aching in the wrist/thumb.  (Tr. 528.)  OT Rising documented continued good progress and toleration of all exercises and stretches.  (Tr. 529.)  In May 2022, Ms. Munion attended occupational therapy twice a week, reporting more pain than she had in April (Tr. 505 (6/10), 508 (5-6/10), 512 (5-6/10), 515 (5-6/10), 519 (6-7.5/10), 522 (5/10)) but still making good progress in her treatment plan (Tr. 506, 510, 513, 516, 520, 523).  As of May 31, 2022, she was still having pain with activity.  (Tr. 506.)  OT Rising advised her to discuss this with her doctor.  (*Id.*)

On June 14, 2022, Ms. Munion saw her primary care physician, Thong Truong, MD, at Warren Medical Group.  (Tr. 793-95.)  She denied musculoskeletal or psychiatric symptoms.  (Tr. 793.)  On examination, her upper extremities, including hands and fingers, were normal to inspection and palpation, and she had 5/5 strength in her fingers bilaterally.  (Tr. 794.)  She was assessed with carpal tunnel syndrome, bilateral upper limbs.  (*Id.*)

On July 18, 2022, Ms. Munion presented to Dr. Butler for evaluation of right-hand numbness and tingling and nodules.  (Tr. 441-47.)  She reported the nodules "came out of nowhere" and denied they were painful.  (Tr. 444.)  Physical examination showed some right-hand weakness, mildly positive Tinel's and Durkin's signs on the right, palpable Dupuytren's nodules along the palm ring digit, and Heberden's nodules of the index, middle, ring, and small fingers with tenderness to palpation over the index finger.  (Tr. 446.)  Dr. Butler ordered a repeat EMG to assess nerve function velocities.  (Tr. 447.)

Ms. Munion underwent the EMG on August 4, 2022.  (Tr. 497-500.)  Compared to her 2021 and 2020 EMG's, the test showed the right median sensory latency had returned to normal, while the left sensory index had improved but was still abnormal.  (Tr. 500.)  Bilateral median motor conduction velocity across the wrist was slightly improved and overall severity bilaterally remained moderate with interval improvement.  (*Id.*)

On August 29, 2022, Ms. Munion saw Dr. Butler following the EMG.  (Tr. 431-40.)  She reported pain at the base of her left thumb with numbness and tingling in her hands, left index, middle, and ring finger joint pain, and right index finger joint pain.  (Tr. 435.)  She endorsed a good response to injections.  (*Id.*)  Her right upper extremity was negative for CMC grind test, was tender over the lacertus, was neurovascularly intact, showed 5/5 strength, and had palpable Dupuytren's nodules along the volar palm ring digit and Heberden's nodes on the index, middle, ring, and small fingers that were tender to palpation over the index finger with mucinous cyst. (Tr. 437.)  The left upper extremity was positive for Tinel's and Durkan's, with Heberden's nodes on the index, middle, ring, and small fingers that were tender to palpation, but also demonstrated full flexion and extension of the fingers and 5/5 strength.  (*Id.*)  Dr. Butler diagnosed Ms. Munion with continued numbness and tingling six-months post-surgery, right-sided Dupuytren's nodules and cords, left carpal tunnel syndrome, left thumb join arthritis, left index, middle, and ring finger joint arthritis, right index finger joint arthritis, and anxiety and depression.  (Tr. 438.)  He ordered a betamethasone injection and prescribed a diclofenac sodium gel to be applied topically as needed for pain up to four times a day.  (Tr. 433.)

Ms. Munion saw Dr. Truong on September 8, 2022 about the nodules on her fingers.  (Tr. 911-13.)  Dr. Truong found her upper extremities, including hands and fingers, normal to

inspection and palpation with 5/5 strength bilaterally.  (Tr. 912.)  He discontinued meloxicam[2] and prescribed celecoxib in addition to Ms. Munion's other prescriptions.  (Tr. 913.)

On October 20, 2022, at Dr. Truong's referral, Ms. Munion saw rheumatologist Magaly Iskander, M.D., M.P.H., at Southwoods Rheumatology.  (Tr. 862-65.)  Physical examination showed mild restriction in flexion/extension of the right wrist, prominent Heberden nodes, Bouchard nodes, and squaring of the left first joint.  (Tr. 864.)  Dr. Iskander diagnosed Ms. Munion with primary osteoarthritis of both hands and feet and carpal tunnel syndrome, bilateral. (Tr. 864-65.)  She advised continuance of Ms. Munion's prescribed medications.  (*Id.*)

On December 7, 2022, at Dr. Truong's referral, Ms. Munion presented to Michael P. Miladore, MD, at Youngstown Orthopedic Associates.  (Tr. 887-92.)  She complained of 10/10 pain in the right wrist with numbness and stiffness and left wrist pain, stiffness, numbness, and tingling.  (Tr. 887.)  She said her symptoms worsened with gripping, pinching, and other activity despite pain medications.  (*Id.*)  Dr. Miladore found Ms. Munion had grossly intact sensation and motor strength in both hands/wrists, could make a tight fist with both hands, had full flexion and extension in both wrists, and had some swelling around the left thumb.  (Tr. 889-90.)  Her left wrist and hand were positive on Tinel's sign, Phalen's maneuver, carpal tunnel compression, and a grind test, she was negative for thenar muscle atrophy.  (Tr. 889.)  Dr. Miladore noted some swelling in the left thumb, with the passive thumb range of motion limited due to pain and crepitus noted with motion.  (Tr. 890.)  He also noted some tenderness at the bilateral index finger DIP joint and at the left bilateral ring finger DIP joint.  (Tr. 889-90.)  X-rays showed left thumb CMC joint osteoarthritis.  (Tr. 890.)  Dr. Miladore diagnosed Ms. Munion with carpal tunnel syndrome left wrist and unilateral primary osteoarthritis of the first carpometacarpal joint,

---

[2] It is not clear from the record who prescribed this regimen of meloxicam and when.  It appears it had been discontinued on June 23, 2021 (Tr. 613), and Plaintiff was taking it again as of June 14, 2022 (Tr. 794).

left hand.  (*Id.*)  He administered two steroid injections in the left thumb and hand and recommended a follow-up in two months.  (*Id.*)

### ii.        Knee and Foot Treatment

Due to reported pain in both knees, Ms. Munion had knee x-rays taken and examined by a radiologist at Mercy Health St. Joseph Radiology on April 10, 2023.  (Tr. 944-48.)  The left knee exam was normal (Tr. 946), and no acute abnormality was found in the right knee (Tr. 948).

On April 27, 2023, Plaintiff sought treatment for her knee pain with Karl S. Kuwik, MD, at Youngstown Orthopedic Associates.  (Tr. 937-40.)  She reported her pain was a 6/10 in both knees and improved with rest and topical treatments.  (Tr. 937.)  Other symptoms included stiffness, swelling, and instability.  (*Id.*)  Upon physical examination, both knees had good range of motion but tenderness in the anterior knee and medial joint line; Ms. Munion had a normal gait.  (Tr. 937-38.)  X-rays obtained that day showed mild degenerative joint disease with slight narrowing of the medial and patellofemoral compartment and neutral alignment in both knees. (*Id.*)  Dr. Kuwik administered cortisone injections in each knee.  (Tr. 939-40.)

On May 24, 2023, Ms. Munion saw James D. Solmen, MD., at Youngstown Orthopedics complaining of "significant plantar foot pain after being up on her feet all day."  (Tr. 965.)  She rated her pain as 9/10 and said it was better while sitting.  (*Id.*)  On examination, she had normal gait, full range of motion in the feet and toes, normal muscle tone, full strength, intact sensation, and no numbness.  (Tr. 967-68.)  Dr. Solmen noted he could not reproduce her pain on examination, and she could not identify where the pain originated.  (Tr. 969.)  The exam was not consistent with tarsal tunnel, thus Dr. Solmen considered plantar fasciitis "the most likely . . . diagnosis."  (*Id.*)  He referred Ms. Munion for physical therapy and recommended supportive

shoes with inserts and limiting walking to every other day.  (*Id.*)  He ordered a two-month
follow-up and requested imaging if no improvement.  (*Id.*)

### iii.  Mental Health Treatment

Prior to and throughout the relevant period, Ms. Munion underwent counseling services
at Valley Counseling Services, Inc. for attention deficit hyperactivity disorder (ADHD) and
depression.  (*See e.g.*, Tr. 816-61.)  In October 2021, she had a telehealth appointment with Erin
Klekot, MD, at which she reported a little anxiety, trouble sleeping due to hot flashes, but no
depression.  (Tr. 828.)  Her speech and thought processes were normal, she was fully oriented,
her mood was euthymic, and her depression and ADHD were assessed as stable.  (Tr. 830-31.)
At this time, she was taking Lamictal, Adderall, and Strattera.  (Tr. 829.)

Ms. Munion's next appointment with Dr. Klekot was on April 14, 2022, after her carpal
tunnel surgery.  (Tr. 834-40.)  She reported that her anxiety and depression were "horrible," she
had trouble falling asleep, and she did not want to get up in the morning.  (Tr. 834.)  Dr. Klekot
noted that Ms. Munion's concentration and function continued to improve with medication.  (Tr.
836.)  On examination, Ms. Munion's speech and thought processes were normal, she was fully
oriented, her attention/concentration was intact, and her mood was depressed and anxious.  (Tr.
836-37.)  Dr. Klekot increased the Lamictal dosage and prescribed trazodone.  (Tr. 838.)

At Ms. Munion's May 12, 2022, telehealth appointment with Dr. Klekot, she reported her
depression and anxiety were "up and down," she still had trouble falling asleep, and she woke up
in the night.  (Tr. 841.)  This was despite having increased her trazodone dose since her last
appointment.  (Tr. 843.)  She requested a different sleep medication and an increase in Strattera
to help with concentration.  (*Id.*)  All psychiatric exam findings were normal, including her

mood, which was euthymic.  (Tr. 843-44.)  Dr. Klekot increased Ms. Munion's Strattera dose as requested, discontinued trazodone, and prescribed mirtazapine.  (Tr. 845.)

Ms. Munion did not return to behavioral health treatment with Dr. Klekot until August 9, 2022, when she attended an in-person session.  (Tr. 848-54.)  She reported continued trouble sleeping and increased depression.  (Tr. 848.)  She presented as tearful and depressed and said she lacked motivation.  (Tr. 850.)  She asked to switch back to trazodone because she gained weight on the mirtazapine.  (*Id.*)  Her concentration was improved over baseline with medication, but she still experienced inattention, distraction, and interrupting.  (*Id.*)  Her speech and thought processes were normal, her attention/concentration was impaired, her mood was depressed, and her affect was constricted.  (Tr. 850-51.)  Dr. Klekot made a plan to wean Ms. Munion off Lamictal, prescribed Topamax, and kept all other medications the same.  (Tr. 852.)

On September 9, 2022, Ms. Munion reported to Dr. Klekot in a telehealth session that her sleep was better with medication, but her anxiety was constant, and her depression was at a seven.  (Tr. 855.)  Her psychiatric exam remained unchanged except that her attention and concentration were intact.  (Tr. 857-58.)  Dr. Klekot continued her medications without change. (Tr. 859.)  At an October 26 telehealth appointment, Ms. Munion reported mood swings, feeling "always depressed," and not sleeping well.  (Tr. 870.)  Her ADHD continued to be improved over baseline with medication.  (Tr. 872.)  Her mental status findings were normal except for impaired attention/concentration and depressed mood.  (Tr. 872-73.)  Dr. Klekot started her on Wellbutrin and kept her other medications the same.  (Tr. 874.)

Ms. Munion returned to see Dr. Klekot in person on January 5, 2023.  (Tr. 923-29.)  She reported no sleep problems but continued to endorse anxiety and depression.  (Tr. 923.)  She said she had not seen improvement after starting Wellbutrin.  (Tr. 925.)  On examination, her speech

10

and thought processes were normal, she was fully oriented, her attention/concentration was impaired, her mood depressed, and her affect normal.  (Tr. 925, 927.)  Dr. Klekot increased the dose of Wellbutrin.  (Tr. 926.)  At the next appointment in March 2023 (Tr. 930-36), Ms. Munion reported doing a bit better on increased Wellbutrin but still struggled with residual depressive symptoms, especially upon waking (Tr. 932).  Her mental status findings were unchanged, with a notation that her depression and ADHD were improved.  (Tr. 932-33.)  Her Adderall was adjusted back to a prior dosage, and other medications were unchanged.  (Tr. 934.)

Ms. Munion returned to see Dr. Klekot on July 14, 2023, who had moved her practice to Compass Family and Community Services.[3]  (Tr. 975-80.)  Ms. Munion reported disturbed sleep, feeling tired and unmotivated, depressed mood, and finger pain.  (Tr. 975.)  She said she was not always using trazodone so as not to become dependent on it.  (*Id.*)  She was fidgety, had coherent speech and expression, normal thought content, and logical thought processes.  (Tr. 976-77.)  Her mood was depressed, her affect constricted, and her attention span and concentration fair.  (Tr. 977.)  Dr. Klekot diagnosed her with persistent depressive disorder (dysthymia) and ADHD, combined presentation, severe, and increased her Adderall and Wellbutrin dosage.  (Tr. 979-80.)

## 2.    Opinion Evidence

On August 8, 2022, state agency medical consultant, Debra Cody-Aron, MD, conducted a physical residual functional capacity ("RFC") assessment of Ms. Munion.  (Tr. 76-77, 85-86.)  Dr. Cody-Aron opined that Plaintiff had the physical RFC to: occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds; frequently push/pull with upper extremities; frequently handle/finger; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday.  (Tr. 76-77, 85-86.)  Dr. Cody-Aron also opined that Ms. Munion could

---

[3] Ms. Munion testified that she was scheduled to see Dr. Klekot on June 7, 2022, but Dr. Klekot informed her that she was resigning or retiring from Valley Counseling.  (Tr. 40, 55.)

occasionally climb ladders, ropes, or scaffolds, could occasionally crawl, and should avoid hand-held vibratory tools.  (*Id.*)

Upon reconsideration on November 7, 2022, state agency medical consultant Elizabeth Das, M.D., affirmed most of Dr. Cody-Aron's findings.  (Tr. 98-100, 110-12.)  However, she additionally limited Plaintiff to only occasionally climbing ramps and stairs and never climbing ladders, ropes, or scaffolds.  (Tr. 98, 110.)

On August 1, 2022, state psychological consultant Kristen Haskins, Psy D., conducted a mental RFC assessment of Ms. Munion.  (Tr. 77-78, 86-87.)  She found Ms. Munion had the mental RCF to:  carry out short cycle tasks in a static setting without demands for fast pace or high production; adjust to minor changes in the work setting; consistently complete an ordinary routine on an independent basis; and adjust to new expectations if major changes are introduced in advance and gradually phased in.  (Tr. 78, 87.)

On reconsideration, on October 22, 2022, state psychological consultant Jennifer Swain completed a mental RFC assessment.  (Tr. 100-01, 112-13.)  She opined that Plaintiff had the mental RFC to: perform simple, repetitive work in an environment with no strict production requirements and only occasional decision-making requirements.  (Tr. 101, 113.)

## C.  Function Report

Ms. Munion completed an adult function report on June 30, 2022.  (Tr. 314-21.)  She reported that the following conditions affected her work: depression, anxiety, not being able to sleep or get out of bed, trouble concentrating or focusing, no strength in right hand after surgery, continuous pain, inability to move wrist, arthritis in both hands, and dropping things.  (Tr. 314.)  She indicated she lived in a house with her boyfriend.  (*Id.*)

On a typical day, Ms. Munion stayed in bed. (Tr. 315.) When she did get up, she sat in the house or sat outside. (*Id.*) She did not take care of any people or animals. (*Id.*) Before her illness or condition, she was able to focus on tasks and use her hands to lift things. (*Id.*) Her conditions affected her sleep in that her mind was "all over the place" and pain in her hands woke her up. (*Id.*) She experienced pain in her hands while bathing; she had difficulty using zippers, buttons, a hair dryer, and a hairbrush; she would drop her razor while shaving; she could not cut food; and she had trouble wiping herself. (*Id.*)

Ms. Munion would set reminders on her phone to take medication but did not need reminders to complete daily hygiene tasks. (Tr. 316.) She did not prepare her own meals; her boyfriend prepared her food. (*Id.*) She did not do any house or yard work due to pain in her hands and "mentally no desire to do so." (*Id.*) She went outside once or twice a day. (Tr. 317.) When she went out, she drove or rode in a car. (*Id.*) She shopped for grocery and personal items in stores approximately once a week for an hour. (*Id.*)

Ms. Munion was able to pay bills, handle a savings account, count change, and use a checkbook/money order. (*Id.*) Her hobbies included occasionally watching television, but her conditions affected her desire to do this. (Tr. 318.) She spent time with others sitting and talking in person and on the phone about once a week. (*Id.*) She did not need reminded to go places and did not need someone to accompany her. (*Id.*) She did not like to go around others while sad and depressed, and she had no social activities because she had no interest in doing things. (*Id.*)

Ms. Munion's conditions limited her lifting, reaching, memory, completing tasks, concentration, following instructions, and using her hands. (Tr. 319.) Her hands would go numb due to carpal tunnel in her left hand, past surgery, and arthritis, and it was difficult to lift or reach for anything. (*Id.*) She is right-handed. (*Id.*) She did not identify any limitations in her ability

to walk or stand.  (*Id.*)  She could pay attention for 10-15 minutes, and did not often finish what she started.  (*Id.*)  She needed spoken and written instructions repeated.  (*Id.*)  She got along well with authority figures and had never been fired or laid off because of problems getting along with others.  (*Id.*)

Ms. Munion said she did not handle stress well and did not like changes in her routine. (Tr. 320.)  She used a prescribed brace/splint when using her hands, and she wore corrective lenses.  (*Id.*)  She was taking Lamictal, Strattera, Trazodone, and Adderall.  (Tr. 321.)

**D.    Relevant Hearing Testimony**

**1.    Plaintiff's Testimony**

At the hearing on June 8, 2023, Ms. Munion testified in response to questioning by the ALJ and her attorney.  (Tr. 37-70.)  She said she lived alone and did not work.  (Tr. 42.)  She had no problems driving.  (*Id.*)

Ms. Munion said she was prevented from working by the condition of her hands.  (*Id.*) She had thumb reconstruction and carpal tunnel release surgery in February 2022.  (Tr. 50.)  This helped her thumb, but not her wrist.  (*Id.*)  Since the surgery, her right wrist would not bend back normally.  (Tr. 46.)  Her surgeon told her she was doing well with therapy, but she disagreed because her hand hurt.  (Tr. 47.)  She testified that her hands always hurt and said she could "cry right now," they hurt so badly.  (*Id.*)  Her surgeon could not tell her why her right hand did not move normally, so she sought a second opinion.  (Tr. 46-47.)  The second doctor would not give her a direct answer either.  (Tr. 47.)

Ms. Munion then developed bumps on her hands.  (*Id.*)  She had noticed the bumps about a year before the hearing, and her doctor told her they were nodules.  (*Id.*)  At first there were a few, but at the hearing they were on every finger except her thumbs.  (*Id.*)  The nodules caused

14

needle-like pain that kept her from spreading her fingers apart (*id.*), and they become larger and more painful the more she used her hands (Tr. 50.)  Ms. Munion said the pain was all over her hands but worst at the joints.  (Tr. 48.)  She took ibuprofen over the counter because a prescription anti-inflammatory had not worked.  (*Id.*)  The ALJ noted for the record that Ms. Munion's hands seemed enlarged around the joints and appeared crooked.  (Tr. 47.)

Ms. Munion said she could not make a tight fist.  (Tr. 48.)  She demonstrated, and the ALJ noted that she did make a fist.  (*Id.*)  Ms. Munion said it was not tight because it hurt too much.  (*Id.*)  Ms. Munion said she could comfortably hold a hairbrush to brush her hair, but she wore her hair in a ponytail because gripping a straightener was "too much."  (Tr. 49.)  She could lift a milk jug out of the fridge if she used both hands, but she could not lift a pot of boiling water to drain pasta.  (*Id.*)  She could button a shirt before she put it on, but once it was on, her hands went numb as she tried to do the buttons going up.  (*Id.*)  She could operate a zipper "very slowly," because she had "no strength in her hands" and could not grip hard.  (*Id.*)

Ms. Munion testified she would probably have release surgery on her left hand at some point, but it was not scheduled.  (Tr. 51.)  She said both hands were "equally bad," and the right was a bit worse.  (*Id.*)

Ms. Munion testified that her depression and anxiety would also affect her ability to work.  (Tr. 53.)  She explained that she did not focus or concentrate, her "mind was all over the place," and it was hard to get out of bed.  (*Id.*)  When she was still working as a housecleaner, it was hard to get everything done because she felt depressed.  (*Id.*)  Ms. Munion started crying during the hearing.  (*Id.*)  She said her depression had worsened over the last year because she was not working.  (Tr. 54.)  In addition to depression, she was being treated for ADHD.  (Tr. 64.)  This impacted her ability to focus, and she was "all over the place."  (*Id.*)

15

Ms. Munion was seeing a rheumatologist and an orthopedic surgeon.  (Tr. 51.)  She last saw her orthopedic doctor five months before the hearing to receive a cortisone shot.  (Tr. 52.)  She saw her rheumatologist every two to three months.  (*Id.*)  She last saw a psychiatrist three months before the hearing.  (*Id.*)   The psychiatrist had just retired, so she had an appointment scheduled for the end of the week with a new one.  (*Id.*)  Ms. Munion had not seen a therapist or counselor for a while.  (Tr. 54.)  She had been taking antidepressants for ten years, but she did not feel they were helping.  (*Id.*)  Her psychiatrist had switched her to Wellbutrin three months before the hearing, and this had made things better but not "totally better."  (*Id.*)

Ms. Munion had quit smoking about five years before the hearing, she did not use drugs, and she did not drink alcohol.  (Tr. 55-56.)

With regards to the activities of daily living, Ms. Munion testified that the previous day, she woke up around 8:30 a.m. and forced herself to get out of bed around 10:00 or 11:00 a.m.  (Tr. 56.)  While lying in bed, she did not read or use her phone.  (Tr. 56-57.)  After getting up, she washed her face, brushed her teeth, dressed, and sat on her porch.  (Tr. 57.)  She sat and watched the neighbors set up a yard sale; she did not read or use her phone or talk to anyone.  (*Id.*)  Around 2:30 or 3:00 p.m., Ms. Munion went into her house and ate lunch.  (*Id.*)  She then watched television until her daughter came over around 4:30 p.m.  (Tr. 57-58.)  Ms. Munion and her daughter talked until around 7:00 p.m. when her daughter left.  (Tr. 58.)  At some point, her daughter went to pick up subs for dinner, and they ate together.  (*Id.*)  After her daughter left, Ms. Munion took a shower and laid in bed to watch television.  (*Id.*)  This was a typical day, but Ms. Munion said some days she did not get out of bed.  (*Id.*)

16

The last time Ms. Munion had gone anywhere was the Sunday before the hearing.  (Tr. 58-59.)  She went to her dad's house for about an hour and half to talk to him because her mom had recently passed away.  (Tr. 59.)

Ms. Munion could do her own laundry, but her daughter had to come over to carry the laundry basket up and down the stairs because Ms. Munion could not grip it.  (*Id*.)  Ms. Munion could do her own cooking, but if she had to do something hard like dump pasta water, her daughter would come over to help and eat with her.  (*Id.*)  Usually, Ms. Munion only cooked for herself and made things like chicken in the air fryer or pre-cut, pre-mixed salad.  (Tr. 59-60.)  She lived in a rental house and did not mow the lawn or do other outside chores except for watering some flowers.  (Tr. 60.)  She went grocery shopping with no problems but had to do small trips and use lots of bags, so they were not too heavy.  (Tr. 60, 63.)  If she had something heavy like a case of water bottles, she would put it in her car and have her daughter take it out when she came over.  (Tr. 60.)

Ms. Munion's daughter lived down the road and came over two or three times a week.  (*Id.*)  Besides helping with heavy groceries and the laundry basket, she helped with whatever Ms. Munion asked her to do.  (Tr. 61.)  She vacuumed Ms. Munion's house and cleaned her bathroom—anything strenuous that required gripping.  (*Id.*)  She also helped Ms. Munion do her hair if she had to go somewhere, because Ms. Munion could not grip the curling iron.  (Tr. 63.)  Ms. Munion was able to dust and wash a few dishes or load her dishwasher.  (Tr. 61.)  She could use her hands for a few minutes, but they became a problem if she did anything "excessive" like try to carry the laundry basket downstairs.  (*Id.*)  Sometimes her hand would go numb, and she had dropped a cup of coffee.  (Tr. 61-61.)  She could eat with a fork but could not cut with a knife because of the pressure it put on her hand.  (Tr. 64.)

Besides her daughter, Ms. Munion socialized with her boyfriend three or four times a week for a couple of hours in the evenings.  (Tr. 62.)  He golfed during the day.  (*Id.*)  Ms. Munion was not allowed to golf with him and said she could not even if she wanted to.  (*Id.*)  She did not play any other sports.  (*Id.*)  Sometimes she went to her boyfriend's house and swam in the pool.  (*Id.*)  They did not go out to eat or do other activities.  (*Id.*)  The only other places Ms. Munion went were her daughter's house and her dad's house.  (Tr. 62-63.)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 65-69.)  The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, and the functional limitations described in the ALJ's RFC determination could not perform her prior work, but could perform representative positions in the national economy, including cafeteria attendant, cleaner/housekeeping cleaner, and routing clerk.  (Tr. 66-67.)  If the RFC contained a further limitation to occasional fingering and handling, there would still be jobs available in the national economy, including school bus monitor, information clerk, and usher.  (Tr. 67.)  However, if the individual was further limited to occasional interaction with the general public, there would be no work available.  (Tr. 68-69.)  The VE also testified that being off task more than 15% of the day or absent more than one day a month on a regular basis would be job prohibitive.  (Tr. 68.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

18

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520[4]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[4] The DIB and SSI regulations are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy.  *Id.*

### IV.    The ALJ's Decision

In his September 6, 2023 decision, the ALJ made the following findings:[5]

1.    The claimant meets the insured status requirements of the Social Security
      Act through March 31, 2024.  (Tr. 20.)

2.    The claimant has not engaged in substantial gainful activity since February
      21, 2022, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: bilateral carpal tunnel
      syndrome, status post release on the right and status post right thumb
      trapeziectomy; bilateral osteoarthritis with Heberden and Bouchard's
      nodes; depressive disorder; ADHD.  (*Id.*)

4.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals the severity of the listed impairments in 20
      C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 22.)

5.    The claimant has the residual functional capacity to perform light work as
      defined in 20 C.F.R. § 404.1567(b) and 416.967(b) with certain
      restrictions. Specifically, the claimant can frequently handle and finger
      objects with the bilateral upper extremities; she can frequently push and/or
      pull with the bilateral upper extremities; she can occasionally climb ramps
      and stairs but never climb ladders, ropes or scaffolds; she can occasionally
      crawl; she can perform no task involving hand-held vibratory tools; and,
      she can perform simple, routine and repetitive tasks but not at a production
      rate pace (e.g., assembly line work).  (Tr. 24.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 28.)

7.    The claimant was born in 1969 and was 52 years old, defined as an
      individual closely approaching advanced age, on the alleged disability
      onset date.  (*Id.*)

8.    The claimant has at least a high school education.  (*Id.*)

9.    Transferability of job skills is not material to the determination of
      disability.  (*Id.*)

---

[5] The ALJ's findings are summarized.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cafeteria attendant, cleaner/housekeeper, and routing clerk. (Tr. 28-29.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from February 21, 2022, through the date of the decision on September 6, 2023. (Tr. 30.)

## V.  Plaintiff's Arguments

In her first assignment of error, Plaintiff argues that the RFC is not supported by substantial evidence. (ECF Doc. 7, pp. 1, 7-13.) In her second assignment of error, she argues that the ALJ failed to properly apply Social Security Ruling ("SSR") 16-3p when evaluating her subjective symptoms. (*Id.* at pp. 1, 13-18.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

21

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**   **First Assignment of Error: The RFC Was Supported by Substantial Evidence**

In her first assignment of error, Ms. Munion argues that the ALJ erred because he adopted an RFC that was not supported by substantial evidence. (ECF Doc. 7, pp. 7-12.) More

specifically, she argues that the RFC does not account for her limited ability to use her hands due to carpal tunnel syndrome, fails to address her limitations in standing and walking due to knee problems and plantar fasciitis, and does not acknowledge the impact of her depression and ADHD.  (*Id.* at pp. 10-12.)  The Commissioner responds that substantial evidence supports the ALJ's RFC determination and that "Plaintiff's recitation of diagnoses and findings amounts to an impermissible request for the court to reweigh the evidence."  (ECF Doc. 9, p. 6.)

A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) "(If your case is at the administrative law judge hearing level . . ., the [ALJ] . . . is responsible for assessing your [RFC].")"; *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician.").

Under SSA regulations, light work requires lifting and carrying of up to ten pounds on a frequent basis and requires occasional lifting and carrying of up to twenty pounds.  *See* 20 C.F.R. § 404.1567(b); SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24 (Jan 1, 1983).  A light exertional job requires "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."  *Id.*  "[T]he full range of light work requires standing or walking, off and on, for a total of 6 hours of an 8-hour workday."  *Id.*  "To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b).

The ALJ determined that Ms. Munion had the RFC to perform to perform light work with the following additional physical limitations:

the claimant can frequently handle and finger objects with the bilateral upper extremities; she can frequently push and/or pull with the bilateral upper extremities;

23

she can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; she can occasionally crawl; she can perform no task involving hand-held vibratory tools; and, she can perform simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work).

(Tr. 24.)

In challenging the RFC, Ms. Munion argues that "substantial evidence did not support a finding that she could perform work at the light level of exertion with frequent handling and fingering." (ECF Doc. 7, p. 9.)  She contends that the ALJ did not acknowledge an August 2022 carpal tunnel diagnosis which she claims provides "objective evidence to support the fact that Plaintiff had difficulties using her hands." (*Id.* at p. 10.)  She also challenges the ALJ's finding that she could stand/walk six hours a day (as required for light work) in light of mild degenerative joint disease in her knees and bilateral plantar fasciitis. (*Id.* at p. 11.)  Finally, she asserts that the ALJ failed to consider the combination of her physical and psychological impairments when determining the RFC.[6] (*Id.* at pp. 11-12.)

The undersigned finds Ms. Munion's arguments to be without merit.  As an initial matter, Ms. Munion acknowledges that the ALJ discussed most of the medical records she summarizes in support of her arguments. (*Id.* at pp. 9-11.)  Thus, to the extent she asks the Court to revisit the evidence discussed by the ALJ and come to a different conclusion, her argument is not well-taken.  This Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387; *see also, Jones*, 336 F.3d at 477.

Ms. Munion's more specific arguments are not persuasive.  First, while the ALJ did not specifically mention Plaintiff being diagnosed with carpal tunnel in August 2022, he discussed

---

[6] Plaintiff also asserts, almost in passing, that the ALJ should have limited her to sedentary work and if he had, she would be automatically considered disabled under the relevant "Grid Rule" based on her age. (ECF Doc. 7, p. 12.) The undersigned finds this argument was inadequately developed and therefore waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

her ongoing carpal tunnel diagnosis extensively: finding bilateral carpal tunnel syndrome to be a severe impairment (Tr. 20); finding it limited Plaintiff's ability to perform work-related activities (albeit not completely) (Tr. 22); and discussing Plaintiff's carpal tunnel release surgery and subsequent treatment (Tr. 25). The ALJ also discussed Plaintiff's subjective reports of pain in her hands and difficulty completing certain tasks (Tr. 24), her reported daily activities (managing personal hygiene, driving, cooking, performing light chores) (*id.*), and objective examination notes documenting arthritis and nodules but also documenting that Plaintiff had full range of motion, sensation, and motor strength in her hands as well as the ability to make a tight fist (Tr. 25-26). He went on to limit Plaintiff to frequent handling, fingering, pushing and pulling "[t]o address her allegations, to the extent supported by the medical evidence[.]" (Tr. 26.)

The ALJ further explained that his RFC determination was more restrictive than the physical functional capacity assessed by the initial state agency medical consultant, who limited Plaintiff, in part, to "occasional climbing ladders, ropes, or scaffolds." (Tr. 27.) The ALJ found the opinion of the state agency medical consultant on reconsideration more persuasive as she found Plaintiff should never climb ladders, ropes, or scaffolds, which would better "maintain [her] safety in the event she is unable to grasp while climbing." (*Id.*) Considering the ALJ's entire written decision, Ms. Munion's argument that the ALJ failed to account for limitations caused by her carpal tunnel syndrome is unsupported and without merit.

This analysis is unaffected by Ms. Munion's assertion that her August 2022 carpal tunnel diagnosis "established that [she] was limited to no more than occasional use of her upper extremities." (ECF Doc. 7, p. 9.) "[A] diagnosis alone does not indicate the functional limitations caused by the condition." *Baker v. Colvin*, No. 1:15-CV-00910, 2016 WL 4128435, at *9 (N.D. Ohio Aug. 3, 2016) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146,

151 (6th Cir. 1990); *Bradley v. Sec'y of Health and Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)).  Here, the ALJ considered the diagnosis alongside objective medical evidence, subjective reports, and medical opinions, and explained how he considered that evidence in formulating the RFC.  Plaintiff has not shown any error in the ALJ's consideration of her carpal tunnel syndrome.

Second, the ALJ did not err in his consideration of Plaintiff's knee and foot problems. Although he concluded that any knee impairment caused by her mild degenerative joint disease was not severe, he noted that due to "its degenerative nature it is likely to persist" (Tr. 25) and accounted for this with RFC limitations (Tr. 27).  Consistent with the state agency medical consultant on reconsideration, the ALJ limited Ms. Munion to only occasionally crawling and climbing ramps or stairs.  (*Id.*)  Ms. Munion's argument that the ALJ failed to account for limitations caused by her knee pain is thus clearly unsupported and without merit.

Relatedly, Plaintiff claims the ALJ erred by not accounting for her foot pain because that pain and her plantar fasciitis diagnosis show she cannot stand/walk six hours a day as needed to engage in light work.  (ECF Doc. 7, p. 11.)  She cites no evidence in the record to support this assertion.  On May 4, 2023, Plaintiff sought treatment for foot pain, but the doctor made no positive findings on examination, except some tenderness on the right foot, could not reproduce Plaintiff's pain, and recommended treatment for plantar fasciitis as the "most likely" diagnosis. (Tr. 967-69.)  This is the only treatment note in the record related to foot pain.  Plaintiff did not complain of foot pain at her hearing, nor did she cite it as a reason she could not work in her testimony or function report.  (Tr. 37-70, 314-21.)  Considering the dearth of evidence related to

26

Plaintiff's alleged foot pain, Ms. Muion's underdeveloped argument that the ALJ erred when he failed to specifically account for her plantar fasciitis is unsupported and without merit.[7]

Third, the ALJ did not fail to consider Ms. Munion's psychological impairments along with her physical impairments in determining the RFC. (*See* ECF Doc. 7, pp. 11-12.) Indeed, the ALJ's decision makes clear that this evidence was considered in formulating the RFC. (Tr. 20, 23, 26-27.) At Steps Two and Three of the sequential analysis, the ALJ found that Ms. Munion's severe impairments included depressive disorder and ADHD and that they caused moderate restrictions in her abilities to concentrate, persist, or maintain pace, and to adapt and manage herself. (Tr. 20, 23.) At Step Four, the ALJ detailed Ms. Munion's mental health treatment history, which included treatment for depression and ADHD symptoms. (Tr. 26.) He mentioned his previous findings that these impairments caused moderate limitations in certain functional capabilities. (Tr. 27.) He also discussed Plaintiff's symptoms of depression and difficulty maintaining concentration, explaining that he accounted for these symptoms by limiting her to "simple routine, and repetitive tasks but not at a production rate pace." (*Id.*) Thus, Ms. Munion's conclusory argument that the ALJ failed to consider evidence of her psychological impairments when formulating the RFC is unsupported and without merit.

In sum, the ALJ's RFC determination regarding Ms. Munion's exertional, manipulative, and mental limitations was supported by substantial evidence. Although the record documents pain and weakness in her hands, degenerative joint disease in her knees, and ongoing depression and ADHD symptoms, it also reflects that many of her physical examination findings were normal, her treatment was largely conservative, and she could reportedly engage in numerous

---

[7] Ms. Munion did not present a developed argument challenging the ALJ's failure to identify plantar fasciitis as a medically determinable impairment (severe or non-severe) at Step Two of the sequential analysis, and any such argument is deemed waived. *See McPherson*, 125 F.3d at 995-96.

activities of daily living, albeit to a limited degree. This evidence is such that "a reasonable mind might accept as adequate to support a conclusion" that Plaintiff is capable of light work with additional limitations as set forth in the RFC. *Besaw*, 966 F.2d at 1030.

For the reasons explained above, the undersigned finds that the ALJ did not ignore evidence or fail to account for limitations caused by Ms. Munion's carpal tunnel, degenerative joint disease, foot pain, or psychological impairments when assessing the RFC. The undersigned further finds that substantial evidence supported the ALJ's conclusion that Ms. Munion could perform light work with the postural and manipulative limitations set forth in the RFC. Accordingly, the undersigned finds Ms. Munion's first assignment of error to be without merit.

**C.     Second Assignment of Error: The ALJ Properly Applied SSR 16-3p.**

In her second assignment of error, Ms. Munion argues the ALJ failed to properly evaluate her symptoms in accordance with SSR 16-3p, and there was not substantial evidence to support his conclusion that her subjective reports were not entirely consistent with the evidence. (ECF Doc. 7, pp. 13-18.) Specifically, she asserts "the ALJ failed to account for Plaintiff's pain related to her continuing hand, finger, and knee problems," and did not "articulate any supportable rationale for his finding that Plaintiff's statements . . . were not entirely consistent with the medical evidence." (ECF Doc. 7, pp. 16-17.).

The Commissioner responds that the ALJ complied with SSR 16-3p by discussing the objective evidence, acknowledging Ms. Munion's subjective complaints, and concluding on that basis that her symptoms were not as disabling as alleged. (ECF Doc. 9, pp. 9-12.) He also argues that Plaintiff has failed to explain how the ALJ's discussion constitutes reversible error and that her "second recitation of evidence the ALJ discussed amounts to an impermissible request for the Court to reweigh the evidence." (*Id.* at pp. 10-11 (citations omitted).)

1.      **Legal Standard for Evaluation of Subjective Symptoms**

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.  There is no real dispute that the first step is met in this case (Tr. 24), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. § 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other

symptoms.  SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).  An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case.  SSR 16-3p, 82 Fed. Reg. 49462, 49467.

### 2.      The ALJ Appropriately Evaluated Plaintiff's Subjective Complaints

Review of the ALJ's decision reveals that he considered Ms. Munion's subjective complaints at length, including her allegations of: pain, numbness, weakness, and difficulty grasping; trouble using zippers, buttons, and knives; an inability to lift heavy things; difficulty getting out of bed at times; a lack of interest in social activities; and difficulty concentrating. (Tr. 24-25.)  The ALJ also considered Ms. Munion's reported daily activities, which consisted of preparing simple meals, driving, light shopping, light cleaning, socializing with her daughter and boyfriend, and managing most of her personal care and hygiene.  (Tr. 24.)

Consistent with SSR 16-3p, the ALJ went on to consider the medical evidence relating to Ms. Munion's medically determinable impairments, including objective diagnostic and examination findings, treatments prescribed to treat her conditions, and her response to treatment.  (Tr. 25-26.)  The ALJ observed that Ms. Munion continued reporting some pain and weakness in her hands and that some physical examinations noted positive findings, but that the exams also noted that she retained full strength, range of motion, sensation, motor strength, and the ability to make a tight fist in both hands.  (*Id.*)  He observed that Ms. Munion's mental health records consistently document a depressed mood and fluctuating concentration/attention, and that her medications were repeatedly modified to address her symptoms.  (Tr. 26.)  He also observed that Ms. Munion's concentration "continued to be improved over baseline with her medications" despite those fluctuations.  (*Id.*)

The ALJ also discussed the medical opinion evidence in support of his RFC.  (Tr. 27.) He found the opinions of the state agency medical consultants persuasive but found the more

restrictive opinion on reconsideration to be most persuasive because it was "well supported by and consistent with findings in the record," accounted for Plaintiff's knee condition, and better accounted for her difficulties grasping.  (*Id.*)  He found that the opinions of the state agency psychological consultants at both levels were partially persuasive; although the consultants' stated limitations were generally supported by the record, the ALJ explained that "certain terms used are nonquantifiable vocationally" and also that he found the record supported mild limitations in understanding, remembering, and applying information and interacting with others, while the psychological consultants had found no limitations in those two areas.  (Tr. 27-28.)

After discussing Ms. Munion's reported symptoms, daily activities, and the medical records at length, the ALJ summarized his findings related to Ms. Munion's subjective reports and incorporated them into the RFC as follows:

> Overall, the medical evidence shows that the claimant does have both physical and psychological limitations regarding her ability to perform basic work tasks due to her impairments. Regarding her physical functioning, the claimant continues to have some difficulties with her bilateral hands and fingers. She testified that she is able to perform a variety of tasks but that ongoing use of her hands increases her symptoms. She also stated that, while she is able to use a fork, she cannot apply pressure to cut food with a knife. To address her allegations, to the extent supported by the medical evidence, I have limited the claimant to no more than frequent handling, fingering, pushing, and pulling with the bilateral upper extremities. In addition, the condition of her upper extremities warrants a restriction from lifting and/or carrying any heavy objects, thus she is limited to light exertional activities. Some postural tasks are also limited due to the upper extremities, including climbing ladders, ropes or scaffolds as she may not be able to adequately grasp as needed and her ability to crawl is also limited with the hand pain as well as reduced range of motion in the right wrist. Finally, the claimant should avoid any hand-held vibratory tools so as to not exacerbate her symptoms and maintain her safety. I have also limited the claimant to only occasional climbing of ramps and stairs to account for her more recent mild degenerative joint disease in the bilateral knees, which is discussed above in Finding 2.
>
> Looking to the claimant's psychological limitations, she testified to feeling depressed and not wanting to get out of bed as well as difficulty maintaining concentration. These allegations are supported by the treatment notes. Regarding the four major areas of mental functioning, the record shows that the claimant has

31

difficulty with concentration as well as coping with stressors. To address these issues, I have limited the claimant to an essentially low stress work environment involving only simple, routine and repetitive tasks.

(Tr. 26-27.)

The ALJ's decision thus considered the factors set forth in SSR 16-3p, contained "specific reasons for the weight given to the individual's symptoms," and made findings that were "consistent with and supported by the evidence." SSR 16-3p, 82 Fed. Reg. 49462, 49467. While he did not explicitly connect specific medical records to his final RFC discussion, reading the decision as a whole, the undersigned finds he "clearly articulated [his reasoning] so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." (*Id.*) The ALJ couched his findings related to the reported symptoms within a detailed discussion of reported daily activities, medical records often showing full strength and range of motion despite pain, mental health treatment notes that represent fluctuating mood/concentration with some positive response to medication, and medical opinions that found her at most moderately limited in relevant areas of functioning. In this context, it is clear that the ALJ adequately articulated his reasons for finding the reported "intensity, persistence and limiting effects" of Plaintiff's symptoms was not "entirely consistent" with the record. (Tr. 25.)

Ms. Munion generally argues that the evidence "supported the fact that Plaintiff had pain issues which interfered with her ability to sustain activities." (ECF Doc. 7, p. 17.) However, "[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts," *Blakley*, 581 F.3d at 406 (internal quotations omitted), and it is not this Court's role to "try the case *de novo*, []or resolve conflicts in evidence[.]" *Garner*, 745 F.2d at 387. Even if substantial evidence supported greater restrictions in the RFC based on Plaintiff's subjective symptoms, this Court

cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

A review of the ALJ decision reveals that his analysis of Ms. Munion's subjective complaints was supported by substantial evidence.  Given the complete evidentiary record and the ALJ's thorough consideration of the evidence discussed above, the undersigned finds that his decision regarding Ms. Munion's subjective symptoms was supported by substantial evidence.

For the reasons explained above, the undersigned finds Ms. Munion has not met her burden to show that the ALJ erred in evaluating her symptoms or that his analysis lacked the support of substantial evidence.  Accordingly, the undersigned finds the second assignment of error to be without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.


July 7, 2025


                                          */s/Amanda M. Knapp*
                                          AMANDA M. KNAPP
                                          United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).